The UNITED STATES

v.

In re Grand Jury Proceedings: Subpoena of Jay WEINER.

The UNITED STATES

v.

In re Grand Jury Proceedings: Phillip Kent SHINNICK.

Nos. 4636 MCD, 4643 MCD.

United States District Court, M. D. Pennsylvania.

July 13, 1976.

Opinion on the Merits Aug. 6, 1976.

Laurence M. Kelly, Asst. U.S. Atty., Scranton, Pa., for plaintiff.

Holly Maguigan, Kairys, Rudovsky & Maguigan, Philadelphia, Pa., Morton Stavis, Newark, N.J., Center for Constitutional Rights, for defendants.

### MEMORANDUM AND ORDER
NEALON, District Judge.

These are matters arising out of an investigation by a grand jury from this district into the possible harboring of federal fugitives Patricia Hearst and William and Emily Harris within this district during the summer of 1974, in violation of 18 U.S.C. § 1071. In connection with the investigation, grand jury subpoenas have been served on Jay Weiner and Phillip Kent Shinnick, ordering them to testify before the grand jury.[1] Both prospective witness-

---

1. Although the subpoena of Shinnick commands him to appear to testify before the grand jury, the government has acknowledged, in its brief in opposition to Shinnick's motion to quash and at oral argument on the motion, that it only intends to have Shinnick produce fingerprints, a handwriting exemplar and a hair sample for the grand jury, and that it does not intend to request his testimony.

es have submitted numerous motions in connection with the subpoenas. Each has filed a motion to quash the subpoena on the grounds of governmental misconduct and improper purpose, a motion to quash the subpoena as returnable to an improper situs, and a motion for disclosure of electronic or other surveillance. In addition, Weiner has filed a motion for protective orders and a motion requesting instructions to the grand jury. The issues raised by the motions have been briefed by the witnesses' attorneys and the attorney for the government, and oral argument was held before this Court on July 8, 1976. This memorandum will address only the motions for disclosure of electronic or other surveillance. The other matters will be considered in a subsequent opinion.

■ In order to isolate the issues raised by the motions in question, their statutory framework must first be set forth. 28 U.S.C. § 1826(a) authorizes a court to confine a witness who refuses "without just cause" to testify before or provide other information or materials to a grand jury when ordered by the court to do so. If the questions posed to the witness or the requests for other information or materials have been based on information derived from illegal electronic surveillance, then "just cause" not to answer or respond exists. *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). To facilitate the determination of whether information was derived from illegal electronic surveillance when a witness claims that such surveillance has occurred, 18 U.S.C. 3504 provides in pertinent part:

"(a) In any . . . proceeding in or before any grand jury . . .

"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act."

Section 3504(b) defines an "unlawful act" as one involving illegal wiretapping or electronic surveillance. In the instant case, the witnesses have asserted that the subpoenas were based on information obtained from illegal electronic surveillance, and the government has denied any connection between the subpoenas and electronic surveillance of any kind. The dispositive questions here are whether the parties have satisfied the requirements of section 3504(a)(1).

At the outset, before analyzing the particular contentions and representations of the parties, it would be well to put this case in proper perspective. This is not a normal case of limited interest involving routine investigative efforts. The "Patty Hearst case" aroused unusual and nationwide interest and concern that exerted an undue amount of public pressure on the government to apprehend Miss Hearst and her Symbionese Liberation Army captors. This pressure undoubtedly stimulated special law enforcement efforts to locate her, including the possible participation of agencies in addition to the F.B.I. Under these circumstances, the possibility that extraordinary measures such as electronic surveillance were used in the investigation seems greater than in most cases. Mindful of the nature and scope of this case, as well as of the court's responsibility under section 3504 to determine whether proceedings have been tainted by illegal electronic surveillance, *see infra*, it would seem that the government's response should be as unambiguous, unequivocal, and reliable as reasonably possible, and should be more dispositive of the possibility of electronic surveillance than in a less extraordinary case. In the usual case which does not have any significance extending beyond this district, the affidavits of the U.S. Attorney and the F.B.I. agent in charge of the case may suffice, but this is not such a case.

It should also be pointed out that this case does not present the situation of an interruption of proceedings of a grand jury that is presently in session and awaiting the appearance of the witnesses who have filed motions resisting an appearance. The

grand jury is not currently in session and no date has been fixed for the appearance of the witnesses involved. While the factor of grand jury delay is, nevertheless, still important, it is not as crucial as it might be were the circumstances different from what they are here.

In support of their assertions of illegal electronic surveillance, both Weiner and Shinnick have filed affidavits describing clicking, hollow and banging sounds and other audio interference during conversations on their telephones and on telephones that they customarily use, especially, in the case of Weiner, during conversations with other persons who were questioned or sought for questioning by the F.B.I. in connection with the Patricia Hearst case. In addition, Weiner describes two coincidences that may be explainable only by wiretapping: on one occasion, he received a telephone call from Jack Scott, warning him that the F.B.I. may question him, and the next day Weiner was visited by F.B.I. agents who asked him about Jack Scott; on another occasion, soon after Weiner's mother told someone over the telephone that Weiner was on his way to Oberlin, Ohio, from Philadelphia, Weiner was apprehended by F.B.I. agents shortly after his arrival in Oberlin. Shinnick alleges no such coincidences, but does state that information was relayed to him from an acquaintance that ". . . the State Police and the F.B.I. had been doing wiretaps the weekend of my visit on Nantucket." Affidavit of Phillip Kent Shinnick, attached to Motion to Quash Subpoena, para. 15. On the basis of these assertions, both witnesses have asked that the government disclose the records of any electronic or other surveillance of any conversations to which they were parties, as well as of any communications at several locations and over several telephones, including the residences and telephones of their attorneys and several other telephones whose numbers the witnesses have listed in connection with the motion.

The government conceded at oral argument that the witnesses' assertions of illegal electronic surveillance amount to "claims" under section 3504, and thus have triggered its obligation under the statute to "affirm or deny the occurrence of the alleged unlawful conduct." The government denies the existence of such surveillance, and, therefore, the critical question here is whether, in the context of this case, that denial is sufficient to satisfy the statute. The government's response to both witnesses is an affidavit by Laurence M. Kelly, an Assistant United States Attorney for the Middle District of Pennsylvania, who is participating in the investigations and who caused the subpoenas at issue to be served.[2] With respect to both witnesses, Mr. Kelly

2. With reference to Weiner, the affidavit provides:

"Laurence M. Kelly, being duly sworn according to law deposes and says:

"1. He is an Assistant United States Attorney for the Middle District of Pennsylvania.

"2. In such position he is participating in an investigation relating to alleged violations of 18 U.S.C. 1071—the Federal 'Harboring' Statute—within the Middle District of Pennsylvania.

"3. He caused a subpoena to be served upon Jay Weiner, through his counsel, on May 19, 1976, requiring his presence before the Federal Grand Jury, Scranton, Pennsylvania.

"4. He knows that the source of information upon which the questioning of Jay Weiner will be based is the testimony of Patricia Hearst given at her bank robbery trial between February 9, 1976 through February 20, 1976, in the U.S. District Court for the Northern District of California, No. 74–364 OJC.

"5. None of the information upon which the questioning of Jay Weiner will be based is the result, directly or indirectly, of any electronic surveillance of Jay Weiner.

"6. The undersigned is unaware of any electronic surveillance of Jay Weiner, directly or indirectly, at any time.

"7. That inquiry was made of the appropriate Agencies of the Federal Government to determine if there had been any electronic surveillance of the conversations of the witness Jay Weiner.

"8. These Agencies were selected as appropriate for inquiry because at the time the requests were made they were the only Agencies that had requested authority to conduct and had conducted electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Public Law 90–351. All national security electronic surveillances authorized by the Attorney General have been conducted solely by, and all records of such

states that the source of information leading to the subpoena, and upon which any questions or requests will be based, is the "testimony of Patricia Hearst given at her bank robbery trial between February 9, 1976 through February 20, 1976, in the U.S. District Court for the Northern District of California, No. 74–364 OJC.", Affidavit Denying Electronic Surveillance, para. 4; that the subpoenas are not based on any electronic surveillance at any location; and that he is unaware of any electronic surveillance of the witnesses. In addition, with respect to Weiner, the affidavit states that a check was made with seven federal agencies that customarily conduct electronic surveillance, and that, based on the results of that check, as of the summer of 1975, "there has been no electronic surveillance occurring on premises known to have been owned, leased or licenses by Jay Weiner . . . ." Affidavit Denying Electronic Surveillance, para. 10.[3] The affidavit concerning Shinnick makes reference to no agency check whatsoever.

■ The government makes a two-pronged argument that its affidavits here are sufficient. It argues first that, regardless of whether there has in fact been any electronic surveillance of the witnesses in this case, the affidavits have obviated the possibility of any nexus between such surveillance and the grand jury proceedings, in that the affiant, the Assistant United States Attorney in charge of the investigations, who caused the issuance of the subpoenas in question, and who will determine what questions are addressed to the witnesses, has stated that he is unaware of any electronic surveillance of the witnesses. Moreover, the government points out, Mr. Kelly has affirmatively identified the source of the present grand jury proceedings—the trial testimony of Patricia

surveillances have been maintained by the Federal Bureau of Investigation.

"9. The Federal Agencies to whom this inquiry was directed are listed as follows, together with the most recent date that a response was received to the inquiries made by the Department of Justice.

"a. Federal Bureau of Investigation—July 16, 1975

b. Drug Enforcement Administration—June 25, 1975

c. United States Secret Service—June 26, 1975

d. Internal Revenue Service—June 27, 1975

e. United Customs Service—July 8, 1975

f. Bureau of Alcohol, Tobacco and Firearms—June 24, 1975

g. United States Postal Service—June 23, 1975

"10. Based upon the results of such inquiry the deponent hereby states that there has been no electronic surveillance occurring on premises known to have been owned, leased or licensed by Jay Weiner, as of the dates set forth above."

With reference to Shinnick, the affidavit provides:

"Laurence M. Kelly, being duly sworn according to law deposes and says:

"1. He is an Assistant United States Attorney for the Middle District of Pennsylvania.

"2. In such position, he is participating in an investigation relating to alleged violations of 18 U.S.C. 1071—the Federal 'Harboring' Statute—within the Middle District of Pennsylvania.

"3. He caused a subpoena to be served upon Phillip Kent Shinnick on May 24, 1976, requiring his presence before the Federal Grand Jury, Scranton, Pennsylvania.

"4. The purposes of this subpoena are as set forth in another 'Affidavit' of the undersigned filed herewith and made a part hereof by reference.

"5. The undersigned is the person who issued the instant subpoena, and knows the source of the information upon which this subpoena is based.

"6. The source of the information leading to this subpoena is the testimony of Patricia Hearst at her Bank Robbery Trial as set forth in the other Affidavit of the undersigned filed herewith, paragraphs 6 and 7, together with the items of physical evidence obtained from locations relevant to the investigation.

"7. The undersigned has no knowledge of any electronic surveillance of Phillip Kent Shinnick at any location at any time.

"8. This subpoena is not based upon any information obtained through any electronic surveillance of Phillip Kent Shinnick at any location."

3. Mr. Kelly stated at oral argument that he had reviewed his materials and could now state that as a result of the check, as of the summer of 1975 there had been no electronic surveillance at any situs of any conversations involving Jay Weiner. He stated that he would submit a supplemental affidavit and the court will assume for the purposes of this discussion that the affidavit is to that effect.

Hearst. Because section 3504 is only concerned with whether something is the "product" of unlawful surveillance, rather than with the unlawful act itself, the government concludes, its affidavits in this case are sufficient. The government's position is contrary to the plain meaning of the statute's language, is inconsistent with the cases construing section 3504, and fails to satisfy the court that the subpoenas in question are not the product of unlawful activity.

■ Upon a claim that evidence is the product of illegal electronic surveillance, section 3504 requires the government to "affirm or deny the occurrence of the unlawful act." It is clear from the plain meaning of the language of the statute that the government's response should go to the existence of the unlawful activity itself, and should not be concerned with the connection such activity may have with the proceedings at issue. The latter is for the court to determine, once the government has completed its function under the statute. *In re Testa,* 486 F.2d 1013, 1016 (3d Cir. 1973). Thus the language of the statute suggests that the adequacy of the government's response depends on the sufficiency of its denial of the existence of electronic surveillance of the witnesses, and not on the relationship of the affiant to the proceedings and whether he is in a position to conclude that there could be no nexus between those proceedings and any unlawful activity.

If the government's position were correct, then all that would be required in every case where a "claim" of illegal electronic surveillance has been made would be a denial by the prosecutor that the proceedings have been tainted by unlawful activity, regardless of whether he is in a competent position to know whether unlawful activity has in fact occurred. The cases which have evaluated the sufficiency of a denial under section 3504, however, have almost all involved affidavits or other documents by persons in a position to know about the existence of electronic surveillance. Most often, the denials contain the results of a so-called "agency check" of the federal agencies that customarily conduct electronic surveillance. *See, e. g., In re Freedman,* 529 F.2d 543 (3d Cir. 1976); *In re Horn,* 458 F.2d 468 (3d Cir. 1972). The courts have frowned upon "to my knowledge" affidavits by persons not in a position to have complete knowledge regarding the existence of electronic surveillance. *See, e. g., In re Quinn,* 525 F.2d 222, 225 n. 5 (1st Cir. 1975); *United States v. Vielguth,* 502 F.2d 1257, 1261 (9th Cir. 1974) (Chambers, J., dissenting).

Finally, in spite of the good faith of the Assistant United States Attorney in this case, which this court has no reason to question, if there has been illegal electronic surveillance of these witnesses, the instant proceedings could be tainted in a manner of which he might be unaware. The investigation of the possible harboring of Patricia Hearst within this district predates her trial by more than a year. Mr. Weiner, for example, testified before a grand jury in Harrisburg investigating the same activity more than a year ago, in March, 1975. Mr. Kelly acknowledged at oral argument that he was not involved in the previous grand jury investigation in this district, and thus a good portion of his knowledge of the pertinent facts of the investigation was presumably acquired by his reading of the government file. There could be some information concerning these witnesses in the file, with its source unknown to Mr. Kelly,[4] that is the product of electronic surveillance. Unless a reliable record of such surveillance is disclosed, it will be impossible to determine whether it has tainted the instant proceedings. With respect to Mr. Shinnick, his counsel stated at oral argument, and the

4. The inquiry may have been based ". . . in some part, on information or leads furnished by other agencies about whose sources and activities neither [the U.S. Attorney nor the F.B.I. agent in charge of the investigation] may know." *In re Quinn,* 525 F.2d 222, 225 (1st Cir. 1975). Furthermore, for the § 3504 response to be adequate ". . . there must be included an explicit assurance indicating that all agencies providing information relevant to the inquiry were canvassed." *id.,* at 226.

government did not deny, that Patricia Hearst's trial testimony identified other persons besides Mr. Shinnick and Mr. Weiner who may have been involved in the harboring of herself and the Harrises in this district. That information would seem to call into question the accuracy of the government's assertion that the sole basis of the grand jury's current interest in the witnesses is Miss Hearst's testimony. If that assertion were correct, then it would seem that the other persons identified by Miss Hearst would have been subpoenaed. Since they were not, it may well be that the source of the current interest in the witnesses is more than simply Miss Hearst's testimony. Because the other sources could be tainted by the illegal electronic surveillance alleged by the witnesses in this case, it is incumbent upon the government to direct its response to the existence of illegal electronic surveillance *vel non.*

█ The government argues alternatively that its response is sufficient, under the facts of this case and under the law of this Circuit, to satisfy the requirements of section 3504. An analysis of the government's affidavits leads to the contrary conclusion. With respect to Weiner, several inadequacies are evident. Although the affidavit purports to be based in part on an agency check, the results are out of date, inasmuch as they only cover a period of up to a year ago. In addition, without regard to its date, the report of the agency check leaves much to be desired. There is no affidavit from the person making or supervising it, nor is there an explanation, by one in a position to know, of the mechanics utilized, or of the record-keeping systems of the agencies involved, so that it is impossible to independently assess the reliability of the check. As to Shinnick, the response is even more deficient. There is no reference to an agency check in the response, nor even an affidavit from the investigating agent. The government simply relies on the "to my knowledge" affidavit of the prosecutor handling the case. These responses fall far short of the comprehensiveness of the denials which have been held to be sufficient by the Court of Appeals for the Third Circuit, see, e. g., *In re Horn,* 458 F.2d 468, 469 n. 3 (3d Cir. 1972); *In re Freedman,* 529 F.2d 543, 549–550 (3d Cir. 1976). Moreover, none of the Third Circuit cases have involved the national overtones and unusual public attention that are present here. In addition, the Court of Appeals has been critical of several of the responses which it has considered. See, e. g., *In re Horn,* supra, at 471; *United States v. D'Andrea,* 495 F.2d 1170, 1174 n. 12 (3d Cir. 1974). Such criticism is consistent with the concern that has recently been expressed by other courts about the reliability of affidavits in support of section 3504 denials. See, e. g., *In re Quinn,* 525 F.2d 222, 225, n. 5 (1st Cir. 1975); *In re Turgeon,* 402 F.Supp. 1239, 1240–1241 (D.Conn.1975). In view of these considerations, as well as of the court's task under section 3504, it seems only fair and proper to require a meaningful and authoritative response by someone who is in a position to attest to the *modus operandi* and dependability of the check.

█ It would appear to be appropriate for the governmental agency ". . . closest to the investigation [to] scrupulously search [its] files and submit affidavits affirming or denying the validity of the aggrieved party's claims and indicating which agencies have been checked." *In re Millow,* 529 F.2d 770, 774 (2d Cir. 1976).[5] In that regard, government counsel stated at oral argument that he believes the F.B.I. has an index card file identifying by name any person whose telephonic conversation had been intercepted, whether or not it was such person's phone that was tapped. In other words, if A, using an outside phone, engaged in a telephone conversation with B, whose phone was under electronic surveillance by the F.B.I., and A was identified during the conversation, then this fact would be placed on an index card bearing

---

**5.** ". . . courts have interpreted the statute to require the Government to make it reasonably clear that its denial is based on sufficient knowledge to be meaningful." *In re Quinn,* 525 F.2d 222, 225 (1st Cir. 1975).

A's name even though he was not the immediate subject of the surveillance. Consequently, a reference to an index card bearing A's name would disclose whether there had been any electronic surveillance *of any conversation* in which A was a participant. It would be helpful for the court to have this information as to the procedure utilized, in as precise a form as reasonably possible, in order to confidently decide whether the government's response is adequate under section 3504. In addition, such information would also provide a basis for evaluating the argument advanced by government counsel at oral argument that an agency check is a burdensome process. It is all too easy to state in conclusory fashion that the undertaking is onerous. The project could conceivably turn out to be a relatively simple assignment. See in this regard Judge Newman's observation in *In re Turgeon,* 402 F.Supp. 1239, 1242 (D.Conn. 1975), with respect to a file check by the F.B.I. similar to the check ordered here, that "(i)t is hard to understand why the task . . . could possibly entail more than one hour's work by a file clerk." Be that as it may, it is impossible to evaluate the merits of the government's claim of burden without some information about the mechanics of the process.

With respect to any delay that might be caused by the procedure ordered here, while any unnecessary delay in grand jury proceedings must be avoided, in circumstances such as those presently before this court we cannot assume that a file check and preparation of affidavits would consume so much time as to cause any inordinate delay. If there is to be an intolerable delay, we should know specifically why a delay is inevitable, the reasons for it, and what can be done to shorten or eliminate it. The issue of electronic surveillance is a volatile one and has caused considerable concern and, indeed, alarm, in our society. Nothing should be left to assumption or speculation. If a responsible check is made and the government has no record of any electronic surveillance, then the denial is official and ". . . the matter is at an end . ." *Gelbard v. United States,* 408 U.S. 41, 71, 92

S.Ct. 2357, 2373, 33 L.Ed.2d 179 (1972) (White, J., concurring).

In order to insure a fair and appropriate disposition of the motions to quash the subpoenas, the government will be allowed ten days from the date of this order to file a supplemental affidavit or affidavits in accordance with the views expressed in this memorandum. In the meantime, the witnesses' motions will remain under advisement.

## ON THE MERITS

In a memorandum and order dated July 13, 1976, this Court ordered the government, pursuant to 18 U.S.C. § 3504, to file supplemental affidavits affirming or denying the occurrence of illegal electronic surveillance which had been claimed in a motion filed by the two witnesses, Jay Weiner and Phillip Kent Shinnick, who had been subpoenaed in these two cases to appear before a grand jury in this district that is investigating the possible harboring of federal fugitives Patricia Hearst and William and Emily Harris within this district during the summer of 1974. In addition, motions to quash on the grounds of improper purpose and the fact that the subpoenas are returnable to an improper situs were filed by both witnesses, and Jay Weiner alone submitted a motion for a protective order and a motion requesting supplemental instructions to the grand jury. In the July 13 memorandum, I deferred ruling on the other motions pending resolution of the electronic surveillance issue. The government has now submitted supplemental affidavits denying electronic surveillance in these cases, and the electronic surveillance issue is ripe for decision. Accordingly, I now turn to that issue, as well as to the other motions filed by the witnesses.

▮ Upon analysis, the affidavits appear to fulfill the conditions imposed by the July 13 memorandum and, therefore, to constitute satisfactory denials of unlawful activity under 18 U.S.C. § 3504. The filings with respect to both witnesses are identical. In each instance, the primary document is an

affidavit by John J. Smythe, an F.B.I. agent in Washington, D. C., who is "responsible for maintaining the records containing the names of individuals who have been identified as being participants in conversations monitored by electronic surveillances conducted by the Federal Bureau of Investigation from 1960 to the present." The Weiner affidavit states that Smythe searched the records in Washington and caused a search to be made of the appropriate field offices of the F.B.I., and that as a result of those searches, the affiant has determined that "Jay Weiner was never the subject of electronic surveillance coverage nor were any of his conversations ever monitored by the Federal Bureau of Investigation." In addition, Smythe states that he has determined that the F.B.I. "did not maintain any electronic surveillance on premises which were known to have been owned, leased, or licensed by Jay Weiner." The Shinnick affidavit is identical in all material respects.

Accompanying the Smythe affidavits are two affidavits by Brandon Alvey, an attorney in the Criminal Division of the United States Department of Justice, one concerning Weiner and one with respect to Shinnick. The Weiner affidavit states that Alvey caused an inquiry to be made of the following six agencies to determine if there has been any electronic surveillance of the witnesses: Drug Enforcement Administration, United States Secret Service, Internal Revenue Service, United States Customs Service, Bureau of Alcohol, Tobacco and Firearms, and the United States Postal Service; and that, as a result of those inquiries, the affiant states that "there has been no electronic surveillances occurring on premises known to have been owned, leased or licensed by Jay Weiner . . ., that there was no electronic surveillance

directed against Jay Weiner . . ., [and] that there have been no overhearings by electronic surveillance of conversations, at any location, to which Jay Weiner was a party." Alvey's Shinnick affidavit is identical in all material respects. In addition, Gary L. Penrith, Bureau Supervisor at the F.B.I. headquarters, Washington, D. C., submitted an affidavit to the effect that he has been involved in all aspects of the Hearst investigation since the kidnapping February 4, 1974, and that the original source of information concerning the alleged activities of Weiner and Shinnick in connection with this investigation was an individual to whom one of the alleged participants made statements and admissions, all of which was corroborated by the testimony of Patricia Hearst during the course of her trial on bank robbery charges in San Francisco, California, November 10, 1975, through March 20, 1976.

■ The Smythe affidavit is a denial, by one in a position to know, of electronic overhearing by the F.B.I., the governmental agency closest to the investigation in this case, of any conversations of the witnesses. Together with the Alvey affidavit, which sufficiently obviates the possibility that other federal agencies authorized to conduct wiretapping have overheard conversations of the witnesses, the Smythe affidavit conclusively and unequivocally denies the claim of the witnesses, under 18 U.S.C. § 3504, that the subpoenas were the product of unlawful electronic surveillance of their conversations. Moreover, the Penrith affidavit identifies the original source of information concerning the two witnesses. As such, the denial is official, and ". . . the matter is at an end . . ." *Gelbard v. United States*, 408 U.S. 41, 71, 92 S.Ct. 2357, 2373, 33 L.Ed.2d 179 (1972) (White, J., concurring).[1]

---

1. It could be argued that the government's response does not constitute a denial of all possible means by which information concerning the witnesses could have been gathered by illegal wiretapping, in that it does not deny the possibility that information concerning the witnesses was learned by overhearing the conversation of two other individuals who may have been

discussing the witnesses. The short answer to such a contention is that section 3504 does not require the government to respond to such a claim. The statute requires the government to respond "upon a claim by a *person aggrieved* . . ." (emphasis supplied). Although section 3504 itself does not define the term "person aggrieved," Title III of the Omnibus Crime

Turning to the other motions, both witnesses argue that the instant subpoenas should be quashed as returnable to an improper situs, in that they are returnable to the current grand jury sitting in Scranton rather than to the Harrisburg grand jury which had previously begun to investigate the alleged unlawful harboring of federal fugitives that is being inquired into here. The witnesses argue in their briefs that this transfer deprives the Harrisburg grand jury of its historic function of deciding for itself what evidence will be produced before it, and is designed "to avoid the possibility that the Harrisburg grand jury, if he were subpoenaed there, would decide that his testimony were not necessary." Weiner's Motion to Quash the Subpoena as Returnable to an Improper Situs, para. 5. At oral argument counsel also maintained that the government's unstated motive in transferring the investigation to the Scranton grand jury is to gain greater leverage over the witnesses by having a grand jury with a longer unexpired term conduct the investigation—under 28 U.S.C. § 1826(a)(2), a witness who refuses "without just cause" to comply with a court order requiring him to testify before a grand jury may be confined for the duration of the term of the grand jury.

The government's response is that it has transferred the investigation to the Scranton grand jury in order to have the investigation conducted by a grand jury selected from the division in which the activity most prominently connected with the alleged harboring occurred—Wayne County, one of the nine counties from which members of the Scranton grand jury are selected. Grand juries in this district are selected on a sectional basis, and thus the Harrisburg grand jury, being selected from a section that does not include Wayne County, could not possibly contain any members who reside in the community where the alleged crime under investigation occurred. Government counsel represented to the court that the investigation has been transferred to the Scranton grand jury out of an abundance of caution in light of the Third Circuit's holding in *Zicarelli v. Gray*, Civ. No. 75–1173 (3d Cir., Nov. 18, 1975), *vacated and rehearing en banc ordered* (January 19, 1976), which held that the exclusion from a petit jury of residents from the county in which the crime allegedly occurred denied the defendant his Sixth Amendment right to the fair possibility for obtaining a jury composed of a representative cross-section of the community.

The government's stated purpose in removing the investigation to Scranton is reasonable, and the court declines to draw the inference offered by the witnesses that the government's motive is underhanded and unlawful, an inference for which the witnesses offer no support other than their own speculation. That the government's concern in light of the *Zicarelli* holding is legitimate and may be well-founded is reflected by the "tentative view" of the Committee on the Operation of the Jury System of the Judicial Conference of the United States "that the indictment for a crime alleged in one division of a judicial district by a grand jury sitting in and selected exclusively from a different division of the district raises some doubt as to whether the rights of the defendant to indictment by a grand jury drawn from a 'fair cross section of the community' are being realized." Memorandum to all Chief Judges, United States District Courts, from William E. Fo-

Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, to which section 3504 expressly relates and in light of which section 3504 should be construed, defines an "aggrieved person" as "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Applying that definition to section 3504, it appears that only those who claim their own conversations were illegally monitored or against whom it was di-

rected have standing to require the government to respond under section 3504. This conclusion is supported by the legislative history of section 3504, which indicates that the government is required to affirm or deny unlawful electronic surveillance only upon a claim "by the defendant *with standing to challenge the alleged unlawful conduct.*" H.R. No. 91–1549, 91st Cong. 2d Sess. (1970), 2 U.S. Code Congressional and Administrative News 4027 (1970) (emphasis supplied).

ley, Deputy Director, Administrative Office of the United States Courts, March 24, 1976, p. 2. Moreover, the Scranton grand jury would be just as free as the Harrisburg grand jury to decide that the testimony of these two witnesses is not necessary. The motions to quash the subpoenas as returnable to an improper situs will be denied.

■ To the witnesses' argument that the subpoenas should be quashed because of misconduct and improper purpose, the government has responded in the form of affidavits by Mr. Laurence Kelly, the Assistant United States Attorney in charge of the instant investigation, that set forth the scope and purpose of the investigation, as well as the relevance to that investigation of the testimony and materials sought by the subpoenas at issue, and disavow any improper purpose on the part of the government. With respect to Weiner, the affidavit sets forth that the investigation seeks to determine whether Patricia Hearst and William and Emily Harris were unlawfully harbored within this district, that there is reasonable cause to believe that Jay Weiner knows the identity and role of the participants in the alleged harboring effort, and that the purpose of the present subpoena is to elicit Weiner's knowledge regarding the alleged harboring.[2] The government's affidavit regarding Shinnick sets forth the same investigation, states that fingerprints, hair strands, and handwriting samples were recovered from the location in this district where the harboring is suspected to have occurred, and says that the purpose of the

2. The Weiner affidavit provides:

"Laurence M. Kelly, being duly sworn according to law deposes and says:

"1. That he is an Assistant United States Attorney for the Middle District of Pennsylvania.

"2. In such position, he is participating in an investigation relating to alleged violations of 18 U.S.C. 1071—the Federal 'Harboring' Statute—within the Middle District of Pennsylvania.

"3. The investigation seeks to determine if during the Summer of 1974, Patricia Campbell Hearst, William Harris and Emily Harris, who were Federal fugitives at the time were harbored near South Canaan, Wayne County, Pennsylvania, within the Middle District of Pennsylvania; and if so, whether any person or persons may have violated 18 U.S.C. 1071.

"4. The investigation seeks to identify all those persons who may have participated in such efforts to harbor and conceal the persons named in paragraph three (3) above, and determine the extent of their respective roles therein.

"5. On September 22, 1975, the fugitives named in paragraph three (3) were captured in San Francisco, California.

"6. Subsequently, Patricia Campbell Hearst was tried on charges of Bank Robbery in the U.S. District Court for the Northern District of California, Cir. No. 74–364 OJC. Between February 9, 1976, and February 20, 1976, she gave testimony at said trial.

"7. Said testimony reflects that several persons may have been involved in the effort to harbor her and the Harris' at a farmhouse in Pennsylvania near Scranton.

"8. Patricia Hearst, as aforesaid, testified that this witness, Jay Weiner, was brought to the farmhouse by two persons where he met Patricia Hearst and the other fugitives names in paragraph three (3) above.

"9. On the basis of this testimony it appears that this witness, Jay Weiner, may have been made privy to the scope of the effort to harbor and conceal the fugitives, including the identity and role of each of the participants.

"10. It is the purpose of the present subpoena to seek information from Jay Weiner before the Grand Jury relating to those persons who may have participated in the efforts to harbor the fugitives named in paragraph three (3).

"11. While some duplication is inevitable, this subpoena is in quest of information different from any previously given by this witness to either Federal Agents or to any other Grand Jury.

"12. This subpoena is not intended to harass the witness in anyway, but is being issued in quest for information relevant to the inquiry.

"13. No prior testimony of this witness has been divulged by the Government to any person not authorized to obtain such testimony under Rule 6(e) F.R.C.P. to the best of the undersigned's knowledge, information and belief.

"14. It is not the purpose of this subpoena to induce the witness to commit perjury. To the contrary, it is hoped that Mr. Weiner will testify fully and honestly in all respects.

"15. It is not the purpose of this subpoena to 'freeze' the prior testimony of the witness. In the first place, such prior testimony is already 'frozen'; in the second place, as stated in paragraph ten (10) above, new and different testimony is sought here.

"16. It is not the purpose of this subpoena to 'rehearse' this witness for any future trials."

subpoena is to obtain fingerprints, handwriting and hair samples from Shinnick for comparison with the items recovered from the harboring location.[3] These affidavits are sufficient to satisfy the government's obligation "to make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose." *In re Grand Jury Proceedings (Schofield I),* 486 F.2d 85, 93 (3d Cir. 1973).

■ The witnesses' contentions as to governmental misconduct are not persuasive. Weiner alleges that he has been harassed by being subpoenaed four times in connection with the Hearst case and by having the grand jury situs changed from Harrisburg to Scranton; that he has been victimized by illegal electronic surveillance; and that he has been subjected to a pattern of abusive behavior by government agents investigating this case. It has already been

determined, *supra,* that the subpoena is not the product of illegal electronic surveillance, and that the government's purpose in moving the grand jury investigation to Scranton is proper. The argument concerning the number of times the witness has been subpoenaed is unpersuasive. As the government points out in its brief, the instant subpoena seeks to compel only the second appearance of Weiner before a grand jury investigating the unlawful harboring within this district, and is intended to elicit information from him in light of a development that has occurred since his initial appearance in March, 1975—the trial testimony of Patricia Hearst in February, 1976. One other subpoena of Weiner to testify before a grand jury in this district was withdrawn after he filed a motion to quash in April, 1975. The fourth subpoena referred to by the witness sought to compel his testimony at the trial of Patricia Hearst in the Northern District of California, and thus has no bearing on possible harassment

**3.** The Shinnick affidavit provides:

"Laurence M. Kelly, being duly sworn according to law deposes and says:

"1. That he is an Assistant United States Attorney for the Middle District of Pennsylvania.

"2. In such position, he is participating in an investigation relating to alleged violations of 18 U.S.C. 1071—the Federal 'Harboring' Statute—within the Middle District of Pennsylvania.

"3. The investigation seeks to determine if during the Summer of 1974, Patricia Campbell Hearst, William Harris and Emily Harris, who were Federal fugitives at the time, were harbored near South Canaan, Wayne County, Pennsylvania, within the Middle District of Pennsylvania; and if so, whether any person or persons may have violated 18 U.S.C. 1071.

"4. The investigation seeks to identify all those persons who may have participated in such efforts to harbor and conceal the persons named in paragraph three above, and determine the extent of their respective roles therein.

"5. On September 22, 1975, the fugitives named in paragraph three were captured in San Francisco, California.

"6. Subsequently, Patricia Campbell Hearst was tried on charges of Bank Robbery in the U.S. District Court for the Northern District of California, Cir. No. 74–364 OJC. Between February 9, 1976, and February 20, 1976, she gave testimony at said trial.

"7. Said testimony reflects that several persons may have been involved in the effort to harbor her and the Harris' at a farmhouse in Pennsylvania near Scranton.

"8. Said testimony mentioned several persons in connection with the three fugitives being brought to the Wayne County premises.

"9. In connection with the investigation several fingerprints were obtained from locations relevant to the inquiry.

"10. In connection with the investigation, several strands of human hair were obtained from locations relevant to the investigation.

"11. In connection with the investigation, items of handwriting were obtained from locations relevant to the investigation.

"12. The purpose of this subpoena is to obtain known fingerprints, handwriting and hair samples of this witness for comparison with the above items that have been recovered during the investigation.

"13. This subpoena is being issued for no purposes other than described above.

"14. No information obtained through the production of the items requested of this witness will be divulged by the Government to any person not authorized to obtain it under Rule 6(e) F.R.C.P.

"15. It is not the purpose of this subpoena to harass the witness in any way.

"16. It is not the purpose of the subpoena to interfere with the employment opportunities available to this witness in any way or to otherwise reduce his opportunities for employment."

caused by the number of subpoenas issued in this district. In any event, the Northern District of California subpoena was also withdrawn without Weiner testifying after Weiner again moved to quash.

■ The witnesses do not draw any direct connection between the alleged abusive behavior by government agents, particularly F.B.I. agents, and the grand jury process at issue here. For example, they do not claim that any physical evidence pertinent to the grand jury investigation was obtained as a result of the agents' allegedly unlawful actions, a claim which, incidentally, would not necessarily be grounds for quashing the subpoenas. *See United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), where the Court held that a witness summoned to testify before a grand jury may not refuse to answer questions on the ground that they are based on evidence obtained from an unlawful search and seizure. They simply maintain that the subpoenas should be quashed, or at least that an evidentiary hearing should be held, because of the alleged abusive behavior of the agents. Such allegations do not constitute grounds for quashing a valid grand jury subpoena. *Cf.* the unreported opinion of Judge Herman in *In re Grand Jury Proceedings* (Scott and Miller), MCD Nos. 4541 and 4542, filed August 22, 1975, at pp. 8–9. As Judge Herman points out in his opinion, a person allegedly victimized by such misconduct may consider an action against the agents themselves, *see Bivens v. Six Unknown Named Agents of Federal Bureau of Investigation,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but may not attempt to thwart a grand jury investigation that has been demonstrated by government affidavit to be proper. Furthermore, to require the ventilation by hearing of every allegation of government misconduct before a witness would be required to respond to a grand jury subpoena ". . . would saddle a grand jury with minitrials and preliminary showings [which] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United*

*States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973).

■ Many of Shinnick's arguments concerning misconduct and improper purpose are similar to Weiner's and are unpersuasive for the reasons described, *supra.* Shinnick argues in addition that the subpoena, by which the grand jury seeks to have him produce fingerprints and handwriting and hair samples, should be quashed because the government already has in its possession two of the items sought—his fingerprints and samples of his handwriting from the military records of his service in the United States Air Force from 1967 to 1971—and because the third item, the hair sample, is irrelevant as it would not be competent evidence against him during a criminal trial. These arguments are also unconvincing. With respect to the fingerprints and handwriting samples, which Shinnick does not deny may be obtained under ordinary circumstances by a grand jury subpoena, *see In re Grand Jury Proceedings (Schofield II),* 507 F.2d 963 (3d Cir. 1975), the government is entitled to "competent fresh evidence," *In re Grand Jury Subpoena Duces Tecum (Southern Motor Carriers Rate Conference, Inc.),* 405 F.Supp. 1192, 1198 (N.D.Ga.1975), and the fact that the government may already have the requested materials in its possession will not ordinarily prevent a grand jury from obtaining them in connection with its own independent investigation. This is particularly so in the case of fingerprints and handwriting samples, since, even assuming the government does have military records with fingerprints and handwriting samples that purport to be Shinnick's, it would have a difficult time at trial establishing that those prints and samples are in fact the witness's. The government does not have to be confronted with such a potential chain of possession problem, and may obtain new fingerprints and writing samples from the witness via the instant subpoena.

■ Shinnick's argument regarding the hair samples requires little comment. Without deciding whether or for what purpose hair strands may be admitted against

a defendant during a criminal trial, although it should be noted that Shinnick's contention that they are *in* admissible as incompetent and irrelevant would not appear to be correct, *cf. United States v. D'Amico,* 408 F.2d 331 (2d Cir. 1969), it is sufficient to note that a witness may not interfere with the course of the grand jury's inquiry by urging " 'objections of incompetency or irrelevancy, such as a party may raise, for this is no concern of his.' " *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974), quoting *Blair v. United States,* 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1919). The motions to quash on the grounds of governmental misconduct and improper purpose will be denied.

 Weiner has moved for a protective order requiring the government to file an affidavit stating whether or not he is a target of the investigation, to certify existing evidence that it has regarding Weiner in order that the witness may be certain that the government does not violate the immunity afforded him before the grand jury by using that testimony to prosecute him at a later date, and to furnish him a transcript of his grand jury testimony. This motion will be denied. The government is under no obligation to so inform a witness before a grand jury whether he is a target of the investigation. With respect to protection against a possible violation of the witness's immunity, he is sufficiently protected by the holding of *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) that, in the event that an immunized witness is subsequently indicted, the prosecution has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665. The request for a transcript of the witness's grand jury testimony is also made with an eye to protecting the witness's rights following a grant of immunity. Weiner argues that he should have a copy of the transcript of his testimony in order that he can more easily determine whether that testimony was used by the government

against him in the event that he is indicted in the future. This request is premature, however, inasmuch as Weiner has not been indicted in connection with the instant investigation. In the event that he is so indicted in the future, the propriety and necessity of his obtaining a copy of his grand jury testimony will materialize. Indeed, under those circumstances, Weiner would be able to obtain by discovery from the government a copy of his grand jury testimony. *See* Rule 16(a)(1)(A), Federal Rules of Criminal Procedure.

Weiner's motion for supplemental instructions to the grand jury will remain under advisement.