**In re John Herbert QUINN, Appellant.**

**No. 75–1359.**

United States Court of Appeals,
First Circuit.

Submitted Oct. 9, 1975.

Decided Nov. 7, 1975.

Vincent de Paul Dunn and Maynard, Dunn & Phillips, Concord, N. H., on brief for appellant.

William J. Deachman, U. S. Atty., and David H. Hopkins, Special Asst. U. S. Atty., Concord, N. H., on brief for appellee.

Before COFFIN, Chief Judge, McEN-TEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal is from the district court's order holding Quinn in contempt for his refusal to answer questions before a grand jury. Quinn initially refused on

the ground of self-incrimination to answer any questions that called for him to do more than identify himself. He was thereupon brought before the court and, on motion of the United States, granted immunity under 18 U.S.C. § 6001 et seq. Upon his continued recalcitrance, the court found him in contempt and ordered him committed. Execution of the court's order has since been stayed to give us time to examine the sufficiency of the reasons Quinn gives for remaining silent.

### Danger of Foreign Prosecution

Quinn argues that the conferred immunity cannot protect him from prosecution by Great Britain and, thus, does not render his coerced testimony non-incriminatory. He points to *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), holding that the fifth amendment protects against federal as well as state incrimination, to show that the threat of foreign prosecution likewise permits invocation of the privilege.

Whether and under what circumstances the valid threat of a foreign criminal prosecution might enable a witness to claim the privilege against self-incrimination has not been decided by the Supreme Court. In *Zicarelli v. New Jersey Investigation Comm'n,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), the Court concluded that, as the witness had not shown a real and substantial danger of foreign prosecution, the issue was not before it.

The investigation here involved Quinn's alleged purchase in New Hampshire of firearms which were later found in Ireland. However, the questions put to Quinn focus upon activities within New Hampshire or, at least, the United States.[1] Quinn does not assert that his answers might disclose that he engaged in compromising conduct while present on British soil and subject to British criminal jurisdiction. Furthermore, with perhaps very narrow exceptions, *see United States v. Honneus,* 508 F.2d 566, 571 & n. 3 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), a nation's criminal laws do not operate extra-territorially. Quinn has not identified any British criminal statute under which he reasonably fears prosecution for conduct to which the questions might relate. *See In re Cardassi,* 351 F.Supp. 1080, 1084 (D.Conn. 1972). On such a record, failing as it does to particularize any real or substantial danger of foreign prosecution, Quinn's claim must fail and no question is presented whether, in an appropriate case, a witness could refuse to testify on that ground.

### Electronic Surveillance

Quinn's other justification for refusing to answer questions was that they were formulated as the result of unlawful electronic surveillance. Quinn raised this claim in an affidavit filed on September 19, 1975.[2] He stated therein that an examination of the questions indicated "clearly and without any doubt that the source for the questions had been obtained through illegal electronic surveillance." He went on to say that he had "suffered greatly by the illegal activities of the Treasury Department, particularly through its agents, a Mr. Philip Tortorella, a Mr. David Carlson,

1. On September 10, 1975, when Quinn was granted immunity and first refused to testify, the Government turned over to the court a list of over 60 questions which, it said, reflected the substance of its intended interrogation of Quinn before the grand jury.

2. Quinn did not make this claim at the first hearing on September 10, 1975, when he was granted immunity and first ordered to testify. There the Government read to the court the specific questions which Quinn had refused to

answer and provided it with an outline of all the questions (*see* note 1, *supra*). Quinn at that time justified his refusal to testify largely on the basis of a fear of reprisals against him and his family because of the strong political overtones of the case.

Quinn appears to have first mentioned the possibility of electronic surveillance at a hearing before the district court on September 12, 1975. The transcript of that hearing is not part of the record before us.

and a Mr. Tinker whose first name is unknown to me, when they came to my place of business on or about November 5, 1974, with cameras and other electronic equipment . . . ." Quinn finally stated that the questions propounded "concerning a telephone conversation with one Frank Sullivan with respect to legal fees, could only have been obtained through an illegal overhear between my attorney and myself."

The Government in turn filed five affidavits pursuant to 18 U.S.C. § 3504. Three responded to Quinn's specific allegation that three agents had come to his place of business with electronic equipment. Philip J. Tortorella, Jr., and David Carlson, both named in Quinn's affidavit, recalled having been in the vicinity of Quinn's store in early November, 1974, but denied conducting any surveillance or using any electronic equipment. John D. Spooner stated that he had gone to Quinn's place of business to take his picture on November 4, 1974, but denied utilizing or having in his possession any electronic equipment.[3]

The other two government affidavits responded to Quinn's more general contentions that the source of the questions was electronic surveillance. William J. Deachman, United States Attorney for the District of New Hampshire, stated that he was familiar with both the investigation into the purchase of a substantial number of firearms by Quinn and the proposed lines of inquiry by the grand jury. He further stated that to his knowledge the basis of all questions was legal investigative effort and he denied "the occurrence of any unlawful act on behalf of the United States on which said inquiry is based and does further deny their formulation on the basis of any court sanctioned or illegal electronic surveillance."

The second affidavit was that of Kendrick L. Sawyer, Special Agent of the Bureau of Alcohol, Tobacco and Firearms, who stated that he was in charge of the investigation, that he had personally conducted a substantial portion of it, and that he was aware of the investigation conducted by the other Special Agents. He further stated that "[i]n the course of my investigation into this matter, no electronic surveillance has been conducted by the Bureau of Alcohol, Tobacco and Firearms, and I am not aware of any electronic surveillance having been or now being conducted by any other law enforcement agency."

The parties appeared before the district court on September 22 at a show cause hearing on the question of contempt. Quinn's counsel requested an evidentiary hearing on the question of electronic surveillance so that he might cross-examine the Government's affiants. The court asked him several times what evidence he had of electronic surveillance, other than the content of the questions, before it would rule on that request. Counsel responded that Quinn's telephone had been constantly out of repair during the period mentioned in the questions, that there has been extensive interference, and "it was his [Quinn's] opinion that he was being tapped at that particular time." Counsel also reported that the telephone company had recently refused to release any information to Quinn concerning any repairs made at that time. No other evidence was offered as a basis for his suspicion.

The court then called Quinn himself to the stand and, while questioning him as to his intent to testify before the grand jury, called upon Mr. Deachman, one of the Government's affiants. The court asked Mr. Deachman if he had been in charge of the investigation in New Hampshire, to which he said yes; and whether, to his knowledge, anyone from any body of the Government had used any kind of electronic surveillance or

---

3. Although Spooner was not mentioned in Quinn's affidavit, a Mr. Tinker was named in connection with this incident. These three affiants stated that they were not acquainted with any Mr. Tinker; it is suggested that Spooner was probably the agent to whom Quinn was referring.

bugging or listening devices in investigating Quinn. Deachman answered that, to his knowledge, there had been none, and the court stated that it accepted that answer. It thereupon continued its questioning of Quinn and held him in contempt.

■ Quinn's claim of privilege is based on the rule that a witness who has been granted immunity may refuse to answer questions if the source of the inquiry is illegal electronic surveillance. *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). Once this claim is made, the Government must "affirm or deny the occurrence of the alleged unlawful act." 18 U.S.C. § 3504.[4] Quinn now contends that the Government's denials were inadequate. The Government argues, on the other hand, that its denials fully answered the allegations made and so were sufficient.

■ Although 18 U.S.C. § 3504 speaks only of denying or affirming the allegedly illegal acts, courts have interpreted the statute to require the Government to make it reasonably clear that its denial is based on sufficient knowledge to be meaningful. *See In re Alfred L. Hodges, Jr.,* 524 F.2d 568 (1st Cir., 1975). A balance must be struck between accepting worthless responses,[5] on the one hand, and, on the other, creating standards so refined and technical as to invite protracted interruption of grand jury proceedings. In general, we shall expect the Government's denial to be amplified to the point of showing that those responding were in a position, by firsthand knowledge or through inquiry, reasonably to ascertain whether or not relevant illegal activities took place; but we shall not ordinarily require evidentiary hearings nor shall we require unrealistically perfect affidavits in connection with a § 3504 response.

■ The present affidavits appear to us to go a considerable distance by meeting Quinn's specific charges and presenting informed denials by those directly concerned with the Quinn investigation. But we find them deficient in one respect. They leave open the possibility that the Quinn inquiry is based, in some part, on information or leads furnished by other agencies about whose sources and activities neither Mr. Deachman nor Mr. Sawyer may know. Both men deny knowledge of any electronic surveillance, but they would not necessarily know the means used by other federal agencies to gather the information, if any, that was furnished to their respective staffs for use in the Quinn investigation.[6]

In some cases, this possibility might seem remote. But the instant investigation involves activities with international overtones which could reasonably have engaged the attention of agencies other than the Bureau of Alcohol, Tobacco and Firearms and the local United States Attorney; and such other agencies might

---

**4.** This section provides in part:

"(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;

. . . . . .

(b) As used in this section 'unlawful act' means any act the use of any electronic, mechanical, or other device . . . in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

**5.** A denial of knowledge of illegal wiretapping is obviously worth nothing if the affiant was in a position to know nothing.

In *In re Alfred L. Hodges, Jr.,* 524 F.2d 568 (1st Cir. 1975), we explained that our decision in *In re Mintzer,* 511 F.2d 471 (1st Cir. 1974), is not to be read as a blanket endorsement for denials consisting solely of the prosecutor's affirmance of lack of knowledge and non-utilization of any taps in framing questions.

**6.** Paragraph (a)(1) of § 3504 refers both to evidence that is the "primary product of an unlawful act" and to evidence "obtained by the exploitation of an unlawful act." If either is claimed, the "unlawful act" must be affirmed or denied.

to some degree have fueled the present inquiry. Indeed, the Assistant United States Attorney handling the case was not from New Hampshire but was specially assigned from the Department of Justice in Washington.

We think, therefore, that for the § 3504 response to be adequate in this case, there must be included an explicit assurance indicating that all agencies providing information relevant to the inquiry were canvassed. This requirement may be met in various ways. The simplest here might be a representation, by supplemental affidavit, that the Government's questions to Quinn are not directly or indirectly, in whole or in part, the product of information from outside investigations, but that they come exclusively from the investigatory efforts of the two agencies about whose activities Mr. Deachman or Mr. Sawyer have knowledge (viz., the New Hampshire United States Attorney's office and the Bureau of Alcohol, Tobacco and Firearms). If there should turn out to be any collateral sources, the Government should, of course, provide affidavits so indicating and showing due inquiry thereof.

We are otherwise in agreement with the district court's disposition of the case.

While arguably the Government might now be allowed to cure the present record by furnishing, if it can, appropriate supplemental affidavits, we think it better practice to vacate the order of the district court finding Quinn in contempt and remand to the same judge who has so far handled the case. He may then consider the matter further in light of this opinion and, upon being furnished with appropriate supplemental affidavits, may determine if Quinn remains recalcitrant and, if so, may readjudicate him in contempt.

*Remanded for proceedings consistent herewith.*