**UNITED STATES, Appellee,**

v.

**Lorenzo OSORIO, Defendant, Appellant.**

**No. 90–1205.**

United States Court of Appeals, First Circuit.

Heard Oct. 1, 1990.

Decided March 26, 1991.

---

Owen S. Walker, Boston, Mass., for defendant, appellant.

Joseph M. Walker, III, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, for appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and WOODLOCK,* District Judge.

WOODLOCK, District Judge.

This appeal from a criminal conviction presents, *inter alia*, the recurring problem of belated government compliance with its duty to provide timely disclosure of exculpatory evidence. What the defendant accurately characterizes as the government's "astounding negligence" in breach of that duty does not, in the circumstances of this case, require a reversal of the conviction. It does, however, provide an occasion to consider how the adverse effects of the problem of governmental failure to make timely disclosure of exculpatory evidence may be ameliorated or eliminated. In doing so, we address the respective responsibilities of defense counsel, government counsel and the courts.

## I.

On June 15, 1989, defendant Lorenzo Osorio and codefendants Manuel Ortiz and Alvaro Gallego were indicted on charges of conspiracy to distribute and distribution of more than 500 grams of cocaine. The charges arose from the June 7, 1989, arrests of the three during a one kilogram cocaine transaction involving the defendants and Thomas Caruso, an FBI-supervised informant.

Osorio filed a discovery motion on July 25, 1989, which included a request that the government be required to furnish him with:

* Of the District of Massachusetts, sitting by designation.

(b) All information known to the government of conduct of any prospective government witness which constituted a crime under federal or state law (even if such witness has not been convicted of a criminal offense because of such conduct).

On August 24, 1989, the magistrate allowed this item of Osorio's discovery motion over the government's opposition. At some point before trial, the government notified the defendant of two pending federal indictments against its chief witness, Thomas Caruso.[1]

Osorio began trial on November 21, 1989, after his codefendants Ortiz (who would testify for the government at Osorio's trial) and Gallego had pled guilty to both counts of the indictment. Caruso testified on the first day of trial, and he was cross-examined by Osorio's attorney. During this cross-examination, Caruso admitted to having possessed a "very small" amount of cocaine in the past, but he testified that he could not remember where or when, and he repeated that his involvement in the cocaine business was limited to the conversations referred to in the conspiracy indictments.

After proceedings ended on the first day, defense counsel received additional information from one of his colleagues regarding Caruso's past drug dealings. This colleague told defense counsel that another Assistant United States Attorney (not engaged in the *Osorio* case) had just told him that Caruso had in fact dealt in drugs. Defense counsel immediately notified the Assistant United States Attorney prosecuting Osorio of the new information he had received.

The next morning, the prosecutor informed defense counsel and the court that he had confirmed with others in the United States Attorney's Office that for approximately 18 months prior to Caruso's December 5, 1988 arrest, Caruso had been involved in the possession and distribution of

1 to 2 kilograms of cocaine per week. The court, with the assent of defense counsel, allowed the prosecutor to recall Caruso to elicit this information. Defense counsel, making neither an objection nor a motion for dismissal or continuance on any grounds, thereafter cross-examined Caruso concerning the newly disclosed information.

The final witness at Osorio's trial was Special Agent Donald Nelson of the FBI, who had arrested Caruso and worked with him thereafter as a cooperating individual. Nelson had monitored the transaction between Caruso and the defendants, and he testified at trial to what he heard transmitted. In addition, Nelson had been present in the courtroom during Caruso's testimony, and he had heard him describe his "very small" past involvement with drugs. Defense counsel asked a series of questions of Nelson on cross-examination in an apparent attempt to show that Nelson knew Caruso had perjured himself and did nothing about it, thus demonstrating that Nelson would have permitted Caruso to testify falsely to convict Osorio. Objections by the prosecutor to several of these questions were sustained.

In closing argument, defense counsel vigorously argued that Caruso lacked credibility, focusing on Caruso's failure to be forthcoming in response to direct questions about his past cocaine dealings. After reviewing several inconsistencies in Caruso's testimony, defense counsel argued to the jury:

> Let's get to the great big whopper here, which shows what kind of person we are dealing with. Yesterday, [Caruso] was brought back, as Mr. Walker quite properly did, to tell the real story, or at least his latest version of his involvement in drugs.... He tells us now, or yesterday, that yes, in fact he had been involved with drugs.... He had

---

1. The first of these, which had been transferred to Massachusetts from the Southern District of Florida, charged Caruso and others with conspiracy to possess with intent to distribute more than 5 kilograms of cocaine. The second charged Caruso with conspiracy to possess with intent to distribute 500 grams of cocaine. The government provided Osorio with no further information before trial concerning any criminal behavior by Caruso.

possessed a kilo a week for 18 months....

Well, why didn't you tell us about that the day before, Mr. Walker asks? Well, that was the small quantity of drugs, and 100 to 150 kilos, whatever it was, that's a small amount because I was actually dealing in the context of 1,000 kilos a week.

Ladies and gentlemen, that is pure bull, I think everyone in this Courtroom recognizes that. Everyone in this Courtroom recognizes the guy is a complete liar, that he perjured himself, and this simply suggests no doubt about it.

Following closing arguments, the trial judge instructed the jurors that once a witness's credibility had been impeached on any matter, the jury could choose to distrust or disregard all of that witness's testimony.[2]

The jury found Osorio guilty on count one of the indictment, the conspiracy to distribute cocaine, but guilty only of the lesser offense of simple possession of more than 500 grams of cocaine on count two. On November 29, 1989, the defendant moved for a new trial, or, alternatively, for a judgment of acquittal on count one, primarily because of the government's failure fully to disclose Caruso's known criminal activities until midway through the trial. The trial court denied the motion on January 8, 1990.

At the sentencing hearing, defense counsel argued for a role-in-the-offense reduction under section 3B1.2 of the Sentencing Guidelines, contending Osorio was a minimal or minor participant in the offense. He requested that the judge make specific findings of fact and rulings of law regarding that issue. The trial judge stated:

I find that Mr. Osorio's participation was not less than the average participation in the crime. I find that on the

whole record. So, as a conclusion of law I rule that the proper guideline range does not include a role in the offense reduction under 3B1.2.

Osorio was sentenced to 78 months imprisonment, the lowest point in the relevant guideline range.

## II.

Osorio contends that the "astounding negligence" of the United States Attorney's Office in failing to notify defense counsel—until halfway through trial—that its chief witness was a major drug dealer was so egregious and so prejudicial that he is entitled to a new trial. The government argues that the delay in disclosure was unintentional, that the defendant still had ample opportunity to cross-examine Caruso fully, and that defense counsel's failure to request a continuance demonstrates a lack of prejudice and thus precludes a new trial. Under the standards in this circuit for evaluating the impact of delayed disclosure, we must conclude that Osorio has not demonstrated the prejudice necessary to entitle him to a new trial.

■ We note at the outset that the precise issue in this case is one of delayed disclosure as opposed to nondisclosure. When dealing with cases of delayed disclosure, "the critical inquiry is ... whether the tardiness prevented defense counsel from employing the material to good effect." *United States v. Devin*, 918 F.2d 280, 290 (1st Cir.1990). In this connection, "a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted." *Id.* See, e.g., *United States v. Ingraldi*, 793 F.2d 408, 411–12 (1st Cir.1986); *United States v. Drougas*, 748 F.2d 8, 23 (1st Cir. 1984); *United States v. Peters*, 732 F.2d

---

**2.** The jury was instructed:

The testimony of a witness may be impeached or discredited by showing that he or she has previously made statements that are different from, and inconsistent with, his or her testimony to you. It is the province of the jury to determine whether or not the credibility of any particular witness has been so im-

peached. I also instruct you that if you find that a witness has knowingly testified falsely to you concerning any material matter in this case, you have a right to distrust and disregard not only that portion of his or her testimony which you find to be false but you are free to reject all of his or her testimony.

1004, 1009 (1st Cir.1984); *United States v. Flaherty*, 668 F.2d 566, 588–89 (1st Cir. 1981). The court must determine first, whether the disclosed evidence was material, and second, whether the defendant was denied the opportunity to use the disclosed evidence effectively. *See Flaherty*, 668 F.2d at 588–89.

■ Evidence is material if its disclosure would create a reasonable probability that the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). "Information useful to impeach prosecution witnesses falls within this rubric." *Devin*, 918 F.2d at 289. Here, information about Caruso's substantial drug dealings could have served to erode Caruso's credibility significantly and thereby diminish the weight a jury would give to his testimony. *See Ingraldi*, 793 F.2d at 411 (citing *Bagley*, 473 U.S. at 676). The late disclosure by the government in this case clearly involved material evidence. Consequently, we turn to the second step of the inquiry and consider whether Osorio has shown that he was prejudiced by the delayed disclosure of Caruso's extensive drug dealings in his ability to prepare and present his case. In other words, we evaluate how well defense counsel was able to use the information despite the delay in its disclosure. *Ingraldi*, 793 F.2d at 411–12.

–A–

*The Responsibility of Defense Counsel*

■ In considering the prejudice to a defendant's case from delayed disclosure of evidence, we have held it "incumbent upon a party faced with such a situation to ask explicitly that the court grant the time needed to regroup, or waive the point.... [A defendant's] claim that he was unfairly surprised is severely undermined, if not entirely undone, by his neglect to ask the district court for a continuance to meet the claimed exigency." *United States v. Diaz–Villafane*, 874 F.2d 43, 47 (1st Cir.) (citing *Szeliga v. General Motors Corp.*, 728 F.2d 566, 568 (1st Cir.1984) ("the remedy for coping with surprise is not to seek reversal after an unfavorable verdict, but a request for continuance at the time the surprise occurs")), *cert. denied*, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). Generally, we have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient opportunity to use the evidence advantageously. *Ingraldi*, 793 F.2d at 413; *see also Diaz–Villafane*, 874 F.2d at 47 ("[i]f, indeed, this was a sneak attack, then a continuance would have been a complete cure").

In response to the delayed disclosure of this impeachment evidence, defense counsel made no objection, motion for dismissal, or motion for a continuance, either at the time he first became aware of it or the next day when it was brought to the court's attention. Defense counsel now asserts that he failed to request a continuance because he was genuinely surprised and did not have a chance to "reflect calmly on what course of action was most advisable when surprises occur."

As a general proposition, of course, opportunities for calm reflection are not the lot of the trial lawyer. A trial holds nothing certain for counsel but the arrival of surprise. And it is doubtful that there is a percipient trial lawyer who would not—given the opportunity for calm reflection—choose, after the dust has settled, to adjust strategies, reformulate questions or pursue additional inquiries. But the motion for a new trial is not designed as a vehicle to indulge such retrospective exercises. The concern of the new trial motion in this context is to provide a remedy for trial counsel who was "prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." *Ingraldi*, 793 F.2d at 411–12. We are satisfied that the delay here did not interfere in this manner with the conduct of Osorio's defense.

Defense counsel was aware of at least the possibility of a problem when he received the information in the afternoon after the first day of trial; he obviously

realized that there might be some need to take some action the following morning. He made no protest at all to the trial judge when the prosecutor requested the opportunity to put Caruso on the stand again "so that the jury may be fully made aware and clarification may be made of portions of his testimony yesterday so that [defense counsel] may have an opportunity to cross examine him on these particular points." Indeed, defense counsel responded to this proposal by saying, "Fine, your honor." The record discloses that defense counsel chose instead to use the opportunity to conduct a vigorous cross-examination of Caruso based on the new evidence.

Caruso retook the witness stand, and testified before the jury to the fact that he had dealt in 1 to 2 kilograms of cocaine per week over an 18 month period. On cross-examination of Caruso, defense counsel established that these transactions would have added up to 78 to 156 kilograms which, at about $20,000 per kilogram, made for two million dollars of cocaine transactions over the 18 months. He continued to question Caruso on the fact that, on the previous day, he had referred to this as a "very small" amount, and had been unable to remember any details about his past drug activities. Defense counsel thereafter further underscored the full extent of Caruso's prior drug activities and his lack of candor about them through cross-examination of FBI Agent Nelson.

We pause to note at this point that the defendant also claims reversible error on grounds that the district court improperly limited the scope of his cross-examination of Agent Nelson in violation of his sixth amendment rights. Specifically, the defendant claims that his case was undermined by his inability to elicit answers to a series of questions designed to show that (1) Agent Nelson was a liar, and (2) Caruso knew he had nothing to fear from the government if he gave false testimony. A number of the government's objections to questions on recross-examination of Agent Nelson were sustained by the court, although specific questions as to what Nelson did or thought were allowed.

For example, at one point defense counsel posed the following series of questions:

[DEFENSE COUNSEL]: Mr. Nelson, after you heard Mr. Caruso's testimony yesterday about his lack of memory of prior drug involvement, but his memory that he was involved in possessing small amounts of drugs, why didn't you raise a question with anyone about whether he was perjuring himself on the witness stand yesterday?

[AUSA]: Objection, Your Honor.

THE COURT: Sustained.

[DEFENSE COUNSEL]: So as far as you're concerned, Mr. Caruso was just telling the truth about everything he said yesterday on the witness stand?

[AUSA]: Objection, Your Honor, argumentative.

THE COURT: Sustained.

[DEFENSE COUNSEL]: And, you, sir, did not raise with [the prosecutor] after you heard Mr. Caruso's testimony yesterday the question of whether Mr. Caruso had lied on the witness stand, did you?

[NELSON]: No, I did not.

[AUSA]: Objection, Your Honor.

THE COURT: He may answer that.

[NELSON]: No, I did not.

[DEFENSE COUNSEL]: And, that is because Mr. Caruso was doing such a fine job in your opinion that it doesn't matter what he says on the witness stand whether true or false, you are going to let him get away with it, aren't you?

[AUSA]: Objection, Your Honor.

THE COURT: Sustained.

It is undisputed that the trial court retains broad discretion to impose reasonable limits on cross-examination to preclude inquiry which is repetitive, harassing, unduly prejudicial, irrelevant, or otherwise improper. *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988). A criminal defendant's constitutional rights under the Confrontation Clause are violated when he is prohibited from engaging in "otherwise appropriate" cross-examination designed to show a prototypical form of bias on the part of the witness and thereby to expose to the jury information on the witness's reliability. *Id. See also Dela-*

*ware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). In the present case, it is apparent that the desired cross-examination was not "otherwise appropriate." The questions put by defense counsel as to which objections were sustained were largely argumentative, and essentially called upon Nelson to give his own opinion concerning the truthfulness of another witness's testimony. It is clear from the record before us that the trial judge could properly exclude these questions as inappropriate cross-examination.

In his brief before us, defense counsel argues that the delayed disclosure: prevented him from obtaining specific information as to the exact nature of these drug dealings; precluded him from conducting an independent investigation of Caruso; hurt his ability to cross-examine Caruso effectively; and detracted from his impeachment of Caruso before the jury. These claims are at best conclusory. "A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a *prima facie* showing of a plausible strategic option which the delay foreclosed." *Devin*, 918 F.2d at 290. Osorio has not done so. Rather, what the record discloses is a workmanlike impeachment of Caruso by defense counsel. The impact of that impeachment was very likely heightened by the fact that Caruso was immediately recalled to the stand for "clarification" of significant evidence he could not recall the day before. Defense counsel capitalized on Caruso's "clarification" with a forceful closing argument well-crafted to anticipate and complement the standard jury instructions on impeachment by prior inconsistent statement which the trial judge thereafter delivered. The strategic judgment made by defense counsel to move forward promptly with the trial, before the government had further opportunity to regroup and attempt to dilute the impact of Caruso's initial dissembling and subsequent strained "clarification," was certainly a reasonable one. Second thoughts precipitated by the defendant's lack of ultimate success do not provide persuasive grounds for a new trial.

–B–

### The Responsibility of Government Counsel

Irrespective of the reasonable strategic use defense counsel made of the late disclosed impeachment material, we still confront the disquieting problem of the government's negligence in meeting its disclosure duties. We have had occasion before to comment on "sloppy practice" in the prosecutor's office with respect to disclosures concerning the impeachable pasts of cooperating government witnesses. *Ingraldi*, 793 F.2d at 413. The negligence here fits that pattern of practice.

The Assistant United States Attorney who tried this case and argued the appeal before us subtly seeks to avoid any personal or institutional responsibility for this negligent failure to provide timely information concerning Caruso's past. In his brief, he argues that "disclosure to the defense took place just 15 hours after the government discovered such evidence." Appellee's Brief at 15; *see also id.* at 12 (defense counsel was "armed with the additional information provided by the government as soon as it became aware of it").

Neither the individual nor the institutional responsibility of government counsel may be sloughed off so easily. It is apparent that Caruso's past was well known to others in "the government," including both the United States Attorney's Office and the FBI, which was using him as a cooperating individual. "The government" is not a congery of independent hermetically sealed compartments; and the prosecutor in the courtroom, the United States Attorney's Office in which he works, and the FBI are not separate sovereignties. The prosecution of criminal activity is a joint enterprise among all these aspects of "the government." And in this prosecution, "the government" as such a joint enterprise plainly did not provide known impeachment

information about Caruso "as soon as it became aware of it."

The kindest interpretation that can be placed on the matter is that there was insufficient diligence within the prosecutor's office regarding a direct order of the court. It is wholly unacceptable that the Assistant United States Attorney trying the case was not prompted personally or institutionally to seek from knowledgeable colleagues highly material impeachment information concerning the government's most significant witness until after defense counsel got wind of it independently and indirectly from another government source.

■ An Assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness. *See generally Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). That constitutional imperative, sharpened in this case by specific court order, is not merely good policy. It is good strategy. No properly prepared trial lawyer should permit himself to be surprised by the vulnerability of his witness, particularly when that vulnerability is well known by his colleagues. To do so needlessly hands a strategic advantage to one's adversary. And it is not merely sloppy personal practice; it implicates the procedures of the entire office for responding to discovery ordered by the court.

The prosecutor charged with discovery obligations cannot avoid finding out what "the government" knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge. The criminal responsibility of a corporation can be founded on the collective knowledge of its individual employees and agents. *United States v. Bank of New England, N.A.*, 821 F.2d 844, 855 (1st Cir.), *cert. denied*, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987). There is no reason why similar principles of institutional responsibility should not be used to analyze the actions of individual government attorneys called upon to represent the govern-

ment as an institution in matters of court-ordered disclosure obligations.

We have recognized institutional responsibility for inquiry on the part of the government in other aspects of the criminal process. In the context of grand jury proceedings, a witness who has been called to testify under a grant of immunity may refuse to answer questions if that witness asserts the inquiry is based on illegal electronic surveillance. *In re Quinn*, 525 F.2d 222, 225 (1st Cir.1975) (citing *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972)). Once a witness makes such a claim, the government bears the burden under 18 U.S.C. § 3504 to "affirm or deny the occurrence of the alleged unlawful act." 525 F.2d at 225; *In re Lochiatto*, 497 F.2d 803, 806, 808 (1st Cir. 1974). We have held that the government cannot meet this burden of denying the alleged illegality until it demonstrates that:

> those responding were in a position, by firsthand knowledge or through inquiry, reasonably to ascertain whether or not relevant illegal activities took place; ... for the § 3504 response to be adequate in this case, there must be included an explicit assurance indicating that all agencies providing information relevant to the inquiry were canvassed.

*Quinn*, 525 F.2d at 225–26; *see also In re Tse*, 748 F.2d 722, 727 (1st Cir.1984) (affidavit of attorney for President's Commission on Organized Crime adequate under *Quinn* where it stated the attorney and others with whom he had checked were in a position definitively to know what information had been supplied to the Commission and the sources of the information); *In re Pantojas*, 628 F.2d 701, 704 (1st Cir.1980) (investigating attorney's affidavit stating he had searched FBI files, discussed case with relevant officials and knew of no electronic interception by the FBI or other law enforcement sufficient to satisfy *Quinn* standard).

As we observed in *Quinn*, "[a] denial of knowledge ... is obviously worth nothing if the affiant was in a position to know nothing." 525 F.2d at 225 n. 5. The government, as represented by its prosecu-

tors in court, is under a duty of inquiry regarding information concerning the criminal past of its cooperating witnesses similar to the duty imposed in *Quinn* when, as here, a specific discovery request is made and granted. Trial counsel for "the government" will not have discharged that duty unless all those in the government in a position to know of such information have been canvassed.

We close this portion of our discussion by observing that it would be no adequate response for trial counsel to suggest negligence on the part of the case agent or the relevant investigative agency. Trial counsel is the member of the government team who is an officer of the court. In this sense, it may be a form of insubordination if the investigative agents working on the case for trial counsel are not forthcoming in satisfying the government's disclosure obligations. But the prosecutor is duty bound to demand compliance with disclosure responsibilities by all relevant dimensions of the government. Ultimately, regardless of whether the prosecutor is able to frame and enforce directives to the investigative agencies to respond candidly and fully to disclosure orders, responsibility for failure to meet disclosure obligations will be assessed by the courts against the prosecutor and his office.

–C–

## The Responsibility of the Courts

Determining the government's negligence in discharging its duty of inquiry does not fully dispose of the issue for the courts. Such negligence is simply the predicate to a judicial evaluation of the impact of that negligence on the trial itself. That evaluation will largely be framed by the remedy sought by defense counsel confronting such government misfeasance. In response to the government's negligence, Osorio's counsel chose not to request a

continuance, the traditional mechanism for dealing with such discovery defaults. Nor did he seek other relief from the district court. Rather, he relied, not unreasonably, on his recross-examination of Caruso, his later examination of Agent Nelson, and his vigorous closing argument to advance Osorio's defense. Under the circumstances, no additional remedy was required of the trial court.

The district court, of course, has broad discretion in handling non-compliance with discovery orders under the provisions of the Federal Rules of Criminal Procedure.[3] *United States v. Richman*, 600 F.2d 286, 292 (1st Cir.1979); *United States v. Gladney*, 563 F.2d 491, 494 (1st Cir.1977). The remedies applied by a court in cases of discovery violations will vary in proportion to the seriousness of the violation and the amount of prejudice suffered by the defendant in each case. *Gladney*, 563 F.2d at 494; *see also United States v. Rossetti*, 768 F.2d 12, 15 (1st Cir.1985) (before mistrial or dismissal warranted, district court may require showing of some level of actual prejudice, depending on seriousness of government's misconduct); *United States v. Hemmer*, 729 F.2d 10, 13 (1st Cir.) (district court must find sufficient prejudice to defendant before extraordinary relief of dismissal warranted), *cert. denied, Randazza v. U.S.*, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *Richman*, 600 F.2d at 292 (district court did not abuse its discretion by failing to grant extraordinary relief of dismissal where neither deliberate wrongdoing by government nor prejudice to defendants was shown).

We apply an abuse of discretion standard when reviewing the decision of the trial judge denying a new trial motion pressed on delayed disclosure grounds. *See Devin*, 918 F.2d at 289. The trial judge's decision here does not need such a deferential standard to be upheld. We are fully satisfied, as was the trial judge, that the delay in

---

3. Fed.R.Crim.P. 16, entitled "Discovery and Inspection," provides in pertinent part:
 (d) Regulation of Discovery
 (2) Failure to Comply With a Request. If ... the court [finds] that a party has failed to comply with [its obligations under] this rule,
the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

disclosure regarding Caruso's past cocaine dealings had no effect on the outcome of the trial and thus does not merit reversal of the conviction.

In the instant case, the district court was well within its discretion in permitting the government to recall Caruso and providing defense counsel with the opportunity for further cross-examination as a remedy for the discovery violation. Defense counsel requested nothing more. There are, however, a number of other mechanisms that a trial judge might employ on request—or *sua sponte*—when confronting government failure to comply with its disclosure obligations. The court might afford the defendant the right to recall the witness without first permitting the government the opportunity to take the sting out of any "clarifications" on direct examination.[4] Or the court could allow defense counsel greater leeway on cross-examination, perhaps including a measure of argumentative questioning. The court might instruct the jury—either after stipulation of the parties or after finding by the court—that the government did not meet its discovery obligations. And, should the United States Attorney's Office continue in a consistent pattern and practice of negligent nondisclosure, resulting in actual prejudice to defendants, the court might conclude that government misconduct has reached a level warranting "the extraordinary relief of dismissal." *See Hemmer*, 729 F.2d at 13; *Richman*, 600 F.2d at 292.

 When confronted with extreme misconduct and prejudice as a result of delayed disclosure, this court will consider invoking its supervisory powers to secure enforcement of "better prosecutorial practice and reprimand of those who fail to observe it." *United States v. Pacheco-Ortiz*, 889 F.2d 301, 310–11 (1st Cir.1989); *see also United States v. Babb*, 807 F.2d 272, 279 (1st Cir.1986). The federal courts may invoke their supervisory powers to remedy the violation of a recognized right, preserve judicial integrity, and deter illegal conduct. *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). These powers must be used sparingly, however, and "may not be mustered to circumvent the harmless error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)." *United States v. Curran* (1st Cir. No. 90–1181, October 29, 1990), *amended and rereported*, 926 F.2d 59, 61 (1991). Without a nexus between improper prosecutorial practice and prejudice to the defendant, misconduct must be characterized as harmless error, and thus beyond the scope of redress under supervisory powers by dismissal or reversal. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988); *Hasting*, 461 U.S. at 506, 103 S.Ct. at 1979; *United States v. Hastings*, 847 F.2d 920, 927–28 (1st Cir.), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988).

The circumstances of the discovery default in Osorio's case do not require invoking our supervisory powers. The government's misconduct has not been characterized as anything other than negligence, albeit "astounding." And Osorio, who chose to seek no special remedy in the district court, has failed to show that the outcome of his trial was prejudiced by the delayed disclosure of the evidence of Caruso's past drug dealings. We thus affirm the trial judge's decision to deny the motion for a new trial.

## III.

The defendant also claims error in the district court's refusal of a downward adjustment for his role in the offense under section 3B1.2 of the sentencing guidelines, and, in addition, its refusal of his request

---

4. While we have recognized the propriety under Fed.R.Evid. 607 of allowing the prosecution, "having called a witness [to] 'take the wind out of the sails' of the defense by questions eliciting possible bases for impeachment," *United States v. Frappier*, 807 F.2d 257, 259 (1st Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1629, 95 L.Ed.2d 203 (1987); *see also United States v. Rivera–Medina*, 845 F.2d 12, 16 (1st Cir.), *cert. denied*, 488 U.S. 862, 109 S.Ct. 160, 102 L.Ed.2d 131 (1988), the trial judge retains the power under Fed.R.Evid. 611 to control the mode and order of interrogation of witnesses and presentation of evidence.

for findings of fact and rulings of law on the issue. Section 3B1.2 provides for a downward adjustment in the offense level based on a defendant's mitigating role in the offense, 4 levels if he was a "minimal" participant (plainly among the least culpable of the group), or 2 levels if he was a "minor" participant (less culpable than most other participants, but not to the point described as minimal) in any criminal activity. *See* U.S.S.G. § 3B1.2 (1989). Osorio argues that he should have been given such a mitigating adjustment because his participation in the criminal activity was limited and was less than that of his codefendants.

■■■ This question involves the application of the guidelines to the facts of Osorio's case, and is subject to our review under a clearly erroneous standard. *See generally United States v. Morales–Diaz,* 925 F.2d 535, 540 (1st Cir.1991); *Diaz–Villafane,* 874 F.2d at 49; *United States v. Wright,* 873 F.2d 437, 443–44 (1st Cir.1989). This standard of review recognizes that application of the guidelines depends on the particular facts of each case, and thus deference should be given the district court's findings because of the trial judge's greater familiarity with all the aspects of the case. *See Diaz–Villafane,* 874 F.2d at 52; *Wright,* 873 F.2d at 443. The clearly erroneous standard is also consistent with the background note to section 3B1.2 of the guidelines, which similarly recognizes that its application "involves a determination that is heavily dependent upon the facts of a particular case." *See* U.S.S.G. § 3B1.2 (1989).

■■■ Examining the record of the district court proceeding, we cannot say that the court's denial of this downward adjustment for defendant Osorio was clearly erroneous. There was evidence presented that, at the very least, Osorio was one of only three charged codefendants in a conspiracy to distribute cocaine; that he initially introduced Ortiz to Gallego, the ultimate

source of the cocaine; that he accompanied Gallego to the site where the delivery of the kilogram of cocaine was to take place; that he apparently vouched for the quality of the cocaine to Caruso; and that he was to receive $300 from this transaction. It was not clearly erroneous for the district judge, based on these facts, to conclude that, "Mr. Osorio's participation was not less than the average participation in the crime," thus precluding him from a downward adjustment for either a minimal or a minor role in the offense. We also note that the district court gave Mr. Osorio the minimum sentence allowed by the guidelines based on his offense level and his criminal history, 78 months (from a range of 78–97 months), followed by supervised release for a period of 4 years (from a range of 4–5 years). The minimum guideline sentence imposed demonstrates that the district court did weigh the defendant's relative role in the offense.

■■■ Nor can we say that the trial court failed properly to resolve the dispute over the role-in-the-offense reduction at the sentencing hearing. The final step of the guidelines procedures is the sentencing hearing, at which time the court hears from both the prosecution and the defense concerning how the guidelines should be applied to the facts of the particular case. *United States v. Wise,* 881 F.2d 970, 972 (11th Cir.1989). When imposing a sentence under the guidelines, the court is required by 18 U.S.C. § 3553(c) to "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c) (Supp.1990). We have interpreted section 3553(c) as requiring the district court to make "reasonably specific findings.... [A]mong other things, the statute requires the sentencing court to explain, generally, how it computed the applicable guideline range." *United States v. McDowell,* 918 F.2d 1004, 1012 (1st Cir.1990); *see United States v. Tucker,* 892 F.2d 8, 11 (1st Cir. 1989).[5]

---

5. The question whether Osorio was entitled to a role-in-the-offense reduction concerns the application of the guidelines, and does not implicate the more stringent requirements of Fed.R. Crim.P. 32(c)(3)(D) for the resolution of factual disputes in the presentence report. Under Rule 32(c)(3)(D), if the defendant claims that there is a factual inaccuracy in the presentence report,

The trial judge's findings, while concise, were adequate to satisfy section 3553(c). They are sufficient for this court to conclude that the denial of the offense level reduction was not clearly erroneous. *See Wise*, 881 F.2d at 973 (findings should be explicit in order to facilitate judicial review and to avoid unnecessary remands). No remand is required.

## IV.

We conclude Osorio is entitled neither to a new trial nor to a remand for further findings in connection with his sentence. The judgment of conviction is

AFFIRMED.

the district court must either make a finding as to the alleged inaccuracy or state that no finding is necessary because the controverted matter will not be taken into account for purposes of sentencing. *United States v. Wells Metal Finishing, Inc.*, 922 F.2d 54, 58 (1st Cir.1991); *United States v. Hanono–Surujun*, 914 F.2d 15, 19 (1st Cir.1990); *United States v. Lyons*, 898 F.2d 210, 217 (1st Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). In addition, Rule 32 requires a written record of these findings to be attached to the presentence report after they are made. *United States v. Gerante*, 891 F.2d 364, 370 (1st Cir.1989). Here, none of the facts in the presentence report regarding Osorio's involvement in the conspiracy are disputed; the dispute is over what the implications of that involvement should be. Thus, the trial judge was not required to meet the demands of Rule 32(c)(3)(D) on this issue.