**UNITED STATES of America**

v.

**Michael J. WHITE, Defendant.**

**Cr. No. 94–10013–PBS.**

United States District Court,
D. Massachusetts.

March 31, 1994.

---

Carole Schwartz and Gregg Sullivan, Asst. U.S. Attys., Boston, MA, for plaintiff.

Cerise H. Lim–Epstein and J. Anthony Downs, Goodwin, Procter and Hoar, Boston, MA, for defendant.

### MEMORANDUM OF DECISION AND OR- DER ON DEFENDANT'S MOTION TO SUPPRESS AND DEFENDANT'S MOTION FOR SANCTIONS

SARIS, District Judge.

Defendant Michael J. White, a former assistant clerk magistrate of the Boston Municipal Court, has been charged in a three count indictment with racketeering in violation of 18 U.S.C. § 1962(c) & (d) and with conspiracy to obstruct enforcement of the state criminal laws with intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511. Among other things, the indictment alleges that, as part of the conspiracy, White solicited and accepted money from Michael Kwong and others in return for providing advance warning of the Boston Police Department's efforts to crack down on the illegal gambling businesses controlled by Kwong and his associates.

On January 14, 1994, defendant was arraigned, and on February 25, 1994, he moved to suppress his January 10, 1992, statements to agents of the Federal Bureau of Investigation.[1] Claiming those statements were "involuntary" and thus obtained in violation of the Fifth Amendment, White also asks the court to declare two years worth of subsequent statements, including his grand jury testimony, as inadmissible "fruits of the poisonous tree." Finally, he seeks sanctions for

---

**1.** White's motion seeks suppression of his "confession of February 13, 1992." The court interprets this as a request to suppress the statements made on January 10, 1992, and thereafter.

government misconduct. A hearing was held on March 22 and 23, 1994, at which Thomas A. Hughes, former Special Agent in charge of the Boston FBI ("Hughes"), and Special Agent James M. Siracusa ("Siracusa") testified for the government. After evaluating the credibility of the witnesses and reviewing the exhibits, the court **DENIES** both motions.

### FINDINGS OF FACT

In the spring of 1991, the FBI began investigating illegal gambling activities by organized crime in the Boston Asian community. Michael Kwong and others were the targets of this probe. Based on electronic surveillance and information provided by confidential informants, the FBI also focused on White. In particular, agents obtained a tape-recorded telephone conversation between Kwong and White on June 25, 1989. Siracusa interpreted that conversation—in light of other information provided by a confidential informant—as an effort by White to solicit payments from Kwong in exchange for tipping him about applications for warrants to search Kwong's Boston gambling den.

Siracusa and Hughes decided that they should try to enlist White as a cooperating witness. Siracusa felt that White, who was accustomed to dealing with judges and lawyers, would best respond to a "structured" presentation from an agent holding considerable rank and importance. They decided to dupe White into coming down to the FBI headquarters. Once there, they would confront him with the evidence against him and have Hughes, an authority figure, seek White's cooperation.

1. *First Encounter: January 9, 1992.*

On January 9, 1992, Siracusa telephoned White at his home at 6:30 A.M., identified himself as an FBI agent, and asked him to come to FBI headquarters to identify an oriental male. He called so early in the morning because he wanted to get White before he went to work. Siracusa told White, falsely, that the FBI was holding a man in custody, and he believed that White, in his capacity as a bail commissioner, had bailed the individual out of jail on a previous occasion. White agreed to come even though he had been up until 4:00 A.M. that morning performing his bondsman's duties. White did not tell the FBI about his early morning activities. Two agents picked White up and drove him to FBI headquarters. He was neither handcuffed nor forced to come in any way.

Siracusa used this ruse because he was afraid that White would decline to come to the FBI headquarters if he were told beforehand that he was the target of public corruption/gambling investigation. Siracusa was also concerned that White would notify other targets of the investigation, and therefore put his physical safety in jeopardy.

Once inside the FBI building, the agents placed White in a small, windowless room. In it were two filing cabinets, one with White's name on it (which was unlocked but empty) and one with Kwong's name affixed. Kwong had been violently murdered two years earlier. Hanging on the wall was one blow-up picture of White and one of the Kung Fu restaurant. The agents played the tape-recording of the June 25th telephone conversation, which had been intercepted pursuant to court order, between Kwong and a man the FBI believed, based on informant information, to be White.

After about ten minutes, White was escorted to Hughes's office. Hughes was in charge of the Boston FBI office and had been in the FBI for twenty-seven years. This conversation took place at about 8:00 A.M. Hughes sat at one side of his desk and White on the other. No one else was present. White was not in custody; nor was he given *Miranda* rights. Hughes told White that he was the target of a corruption investigation, and that he faced charges of extortion, racketeering, and maybe money laundering. He pointed out that the racketeering charge carried a maximum twenty year sentence, and that his agents were confident they had enough evidence to convict him. Hughes solicited White's cooperation, but did not say what that cooperation would entail. If White were willing to cooperate, Hughes would turn him over to the agents; if he did not want to cooperate, Hughes said he would be free to leave. White replied that he could not un-

derstand why the FBI was focusing on him, and Hughes repeated the allegations against him. White then said he was ready to leave. Hughes went to the office door and asked the agents to escort him out.

When White left the FBI building he was distraught, emotionally stressed, and tense. Hughes did not make a written record of this encounter. The entire conversation took five to seven minutes. Hughes never promised White that he would not be indicted if he cooperated. Nor did he threaten him with indictment if he refused to cooperate. No promises or threats of any kind were made. White was never placed in handcuffs or restrained. At no point was White in custody.

### 2. *Second encounter: January 9, 1992.*

Because White looked so pale, Hughes suggested that Siracusa and another agent should go to White's residence at 151 Tremont Street to make sure he did not hurt himself. They walked from the J.F.K. building to 151 Tremont, and asked the concierge to call upstairs. When the concierge called White, he told the concierge to let the agents upstairs. As they all were sitting on the couch, Siracusa again tried to solicit White's cooperation. When the agents expressed concern about White's emotional state, he said he was all right. White said he would think about it and get back to them in one hour. The agents were in the apartment for less than fifteen minutes, and White never asked them to leave. Again, White was not in custody.

### 3. *Third encounter: January 9, 1992.*

One hour later White called Siracusa on the telephone and said he wanted to talk. They arranged to meet at Phillips Drug store on Cambridge Street, Boston. After meeting they drove to the Royal Sonesta Hotel in Cambridge, where Siracusa rented a one bed hotel room. Siracusa told White information about the investigation into Asian organized crime and replayed the tape-recording with Michael Kwong. White, although not denying it was his voice, said that it was the FBI's statement that he was on the tape, not his. Siracusa responded: "We're fairly certain it

is you." White got up, left, and made his own way home.

### 4. *Fourth Encounter: January 10, 1992.*

On January 10, 1992, at 2 *P.M.*, White called Siracusa and said he wanted to talk with him again. Siracusa said: "Are you willing to come tell us the truth about your corrupt activities?" White walked to FBI headquarters and met with Siracusa and Special Agent Angelo Rinchiuso. He was never placed in handcuffs or restrained. Again, the tape was played. This time White identified himself as the man on the tape talking with Kwong. He said that he was soliciting a bribe of $500 in exchange for tipping search warrants targeted at Kwong's gambling establishment. After he made this admission, Siracusa asked White if he was willing to cooperate by recording conversations over the telephone and in person. He also promised to protect White by FBI surveillance when he was acting undercover. Siracusa made no promises regarding the resolution of White's prior criminal acts; however, he did say that he would advise the appropriate legal authorities about White's cooperation. He expressly said that he could make no guaranties about the course of action that the office of the United States Attorney would take. There was neither a threat that he would be indicted if he did not cooperate nor a promise that he would not be indicted if he did cooperate. Siracusa further advised White that he could have an attorney negotiate a written agreement regarding the cooperation with the United States Attorney's office, and that Siracusa would be happy to work with any lawyer of White's choosing. White rejected that suggestion, stating that he did not trust any lawyers.

Agreeing to become a consensual witness for purposes of taping conversations with other suspects, White consented to set up a meeting with one Bobby Lam the next day. Earlier in the discussion, White said that Lam was a gambler whom White had bailed out in late 1990 or 1991. Lam had approached him and said he wanted the same deal that White had arranged with Kwong. White said that Lam had given him money to

tip search warrants. Until White's disclosure, the FBI had not had known about Lam's involvement in any illegal activities. Siracusa agreed that Lam could serve as the target of White's consensual recordings.

##### 5. *Fifth Encounter: January 11, 1992.*

On Saturday, January 11, 1992, Siracusa and Rinchiuso went to White's apartment and attached a tape-recorder to White's phone. They also had White execute a consent form. White then contacted Lam and set up a meeting for the next week. The agents kept the tape. There was no further contact with the FBI that day or the next.

##### 6. *Sixth Encounter: January 13, 1992.*

On Monday, January 13, 1992, White was scheduled to meet with Lam at Turner Fisheries. Siracusa and Rinchiuso met with White in his apartment and tape-recorded a telephone conversation between White and Lam confirming the meeting. The agents and White also worked out a system by which the agents were allowed by the concierge into White's building without waiting or calling up to White's unit. White wore a body recorder on his person when he met with Lam that evening at Turner Fisheries. Again on January 13, 1992, White executed a consent form.

##### 7. *Remainder of the Investigation.*

While continuing to serve as an assistant clerk magistrate and bail commissioner over the next two years, White worked as a cooperating witness for the FBI in its investigation into organized crime in the Asian–American community. He always returned the agents' calls and tape-recorded many conversations on his own without FBI assistance. The FBI, realizing that White had a serious gambling problem, occasionally assisted him in paying his living expenses. At one point, White took money from the state bail fund for gambling debts and the FBI gave him $2,000, which he used to pay back the state.

The FBI also pressed White to divulge any knowledge he had about judicial corruption. He had none. White refused to cooperate in providing information about a loanshark who helped him pay his gambling debts.

In November of 1993, White testified as a government witness before the grand jury. This testimony helped produce an indictment against sixteen defendants charging racketeering, extortion, conspiracy, and bribery. White was not represented by an attorney at the time of his testimony.

White's statements on January 10, 1992 and all subsequent statements were voluntary. While the FBI's method of soliciting his cooperation was certainly designed to exert psychological pressure, White's will was not overborne. His statements were, at all times, the product of a rational intellect and free will. Nor did the FBI induce the statements by using threats, promises, or tricks.

### *CONCLUSIONS OF LAW*

 A defendant's involuntary statement may not be introduced at trial against him for any purpose and doing so amounts to a denial of due process of law. *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416–17, 57 L.Ed.2d 290 (1978); *see New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979) ("as opposed to statements taken in violation of Miranda, [an involuntary statement] may not be put to any testimonial use whatever against [a defendant] in a criminal trial").[2] The burden is on the government to prove by a preponderance of the evidence that a defendant's confession was voluntary. *United States v. Jackson,* 918 F.2d 236, 241 (1st Cir.1990). The central question is: "whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act." *Id.* (quoting *Bryant v. Vose,* 785 F.2d 364, 367–68 (1st Cir.); *cert. denied,* 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986)); *see also Procunier v. Atchley,* 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d

---

**2.** Defendant has not alleged that the government violated *Miranda.* There is nothing in the record to suggest that White was in custody when he made any statements. *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d

714 (1977) (defendant not in custody when he voluntarily goes to a police station to be interviewed and his freedom to depart is not restricted).

524 (1971). The government must prove that the statements were the product of a rational intellect and free will, and that no physical or psychological pressures overrode the defendant's will. *See United States v. Lawrence,* 889 F.2d 1187, 1189 (1st Cir.1989).

Psychological coercion may, in certain circumstances, render an admission involuntary. *See, e.g., Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920–21, 9 L.Ed.2d 922 (1963) (threats to a defendant mother, unsophisticated in criminal law, that state financial aid to her infant children would be cut off if she failed to cooperate rendered her confession involuntary). Promises of leniency may similarly make a confession involuntary. *See, e.g., United States v. Rogers,* 906 F.2d 189, 192 (5th Cir.1990) (confession was involuntary because defendant acted in reliance on officers' promise that he would not be arrested if he cooperated); *United States v. Pinto,* 671 F.Supp. 41, 58 (D.Me.1987) (officer's statements that caused defendant to believe that only officer possessed the power keep defendant out of jail and that officer would do so if defendant confessed made waiver involuntary).

■ In deciding whether the defendant's will was overborne by either promises or threats, whether direct or implied, the court must look at the totality of the circumstances surrounding the admission. *See Jackson,* 918 F.2d at 241 (although there was an implied threat or promise that defendant's sister might be spared harm if he confessed, in light of defendant's very substantial previous experience with the criminal justice system, in the totality of the circumstances, defendant did not lose volitional control); *see also* 18 U.S.C. § 3501(b) ("The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession."). *Compare United States v. Bram,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). While defendant emphasizes *Bram*'s language that a voluntary confession must not be "obtained by any direct or implied promises, however slight, nor by the exertion

of any improper influence," *id.,* he acknowledges that the proper test is the "totality of the circumstances." *See Jackson,* 918 F.2d at 242 ("Although *Bram* has not been overruled, it has been modified.... [Courts] look at the totality of the circumstances, *including* any promises or threats ... to see whether the will of accused was overborne." (emphasis in original)); *Pinto,* 671 F.Supp. at 57 ("Notwithstanding the implication in *Bram* that any promise taints a statement subsequently made, the more recent decisions consider a variety of factors, including the nature of the promise, the context in which the promise was made, [and] the characteristics of the individual defendant...." (internal citations omitted)).

■ After considering the totality of the circumstances here, the court concludes that the government has met its burden of proving that White's statements were the product of a rational intellect and free will, and that the psychological pressure employed by the FBI did not overcome his will. In particular, the court relies on the following factors. First, White was an assistant clerk magistrate and a bail bondsman who was familiar with the criminal justice system. Second, although the FBI deceived White to get him to the FBI office and attempted to use psychologically coercive techniques to obtain his cooperation in the early morning hours of January 9, 1992, the bottom line is that White walked out of the FBI's offices without making any incriminating statements at that time. In the two subsequent contacts with the FBI that day, each time White declined to give the agents a statement. Perhaps most importantly, *White was the one who initiated contact with the FBI on January 10, 1992,* and it was during that meeting that he confessed and agreed to cooperate. There is no credible evidence to support a finding that the agents' techniques were sufficiently coercive or duplicitous to overbear White's will when he confessed to his role in conspiring to betray the confidentiality of search warrant applications.[3]

---

**3.** White did not testify at the hearing. To the extent his affidavits contradict the accounts given by Hughes and Siracusa, the court credits the

agents' version. *Cf. United States v. Gardner,* 611 F.2d 770, 774 n. 2 (9th Cir.1980) ("In evaluating Gardner's showing of electronic surveillance and

Third, I fully credit the testimony of Hughes and Siracusa that there were no direct or indirect promises to induce White's cooperation, except the promise to bring White's efforts to the attention of the U.S. Attorney's office. This promise was not sufficient—taking into account all the circumstances surrounding White's contact with the FBI—to render his January 10, 1992, confession involuntary. *See United States v. Baldacchino,* 762 F.2d 170, 178–79 (1st Cir.1985) ("A promise to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible."); *see also United States v. Willard,* 919 F.2d 606, 608 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 208, 116 L.Ed.2d 167 (1991). Furthermore, White made a voluntary choice to cooperate without the assistance of counsel despite Siracusa's suggestion that an attorney could negotiate a written agreement with the office of the United States Attorney. Finally, White was never in custody during any of his initial contacts with the agents or throughout the period of his cooperation.

Although the FBI did use a trick to lure White to its offices, that ruse was insufficient to render any statements involuntary because White must have realized, as soon as he entered the room with the tape recorder, the reason that he had been beckoned. *See Colorado v. Spring,* 479 U.S. 564, 575–76, 107 S.Ct. 851, 858–59, 93 L.Ed.2d 954 (1987) (after defendant was arrested on a firearms charge and questioned on that topic, ATF agents' failure to inform him that he would be questioned about an unrelated murder case did not constitute official trickery sufficient to invalidate defendant's waiver of Fifth Amendment); *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969) (Using the totality of the circumstances test, the court concluded: "The fact that the police misrepresented the statements that [a co-conspirator] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession in-

admissible."); *cf. Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 2397–98, 110 L.Ed.2d 243 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."). In any event, he certainly realized that he was not there to identify a suspect for the FBI. As noted before, White made the incriminating statements at issue over twenty-four hours after he realized he was "tricked."

At the motion hearing White argued that the agents misrepresented the strength of their case to him at the initial meeting on January 9, 1992, which impermissibly contributed to forcing his subsequent confession. The taped conversation contains inculpatory evidence against White. For example, the transcript could fairly be read to reflect a conversation in which Kwong offered White "five a week" for information about search warrants, even though White gave the disclaimer that he couldn't guarantee telling Kwong the day the police get the warrant unless he himself signed it. In as much as White alleges that the "trickery" was the FBI's misrepresentation of the evidence against him, White himself heard the tape three times before he confessed and could evaluate himself the strength of the evidence. *Compare Frazier v. Cupp,* 394 U.S. at 739, 89 S.Ct. at 1424–25; *see also Evans v. Dowd,* 932 F.2d 739, 740–42 (8th Cir.) (per curiam) (confession voluntary even though officer misstated purpose of the interrogation and falsely stated that he had an eyewitness), *cert. denied,* —— U.S. ——, 112 S.Ct. 385, 116 L.Ed.2d 335 (1991). In addition to the tape, the FBI had developed other damaging evidence against White by January 9, 1992 through the use of a confidential informant.

■ In alternatively moving for sanctions, White argues that, independent of the voluntariness question, the government conduct warrants an order suppressing the confession and precluding use of the agents' testimony at trial. *See United States v. Osorio,* 929

the Government's response, we give greater weight to the testimony, which was subject to

cross-examination, than to the affidavits.").

F.2d 753, 763 (1st Cir.1991) ("When confronted with extreme misconduct and prejudice ... th[e] court [may] invok[e] its supervisory powers to secure enforcement of better prosecutorial practices and reprimand of those who fail to observe it." (internal quotes and citations omitted)). These questions are, however, subsumed in the court's factual findings and conclusions of law regarding the voluntariness of White's statements. There was no believable evidence produced to support a finding of outrageous governmental misconduct.

Defendant argues that Siracusa and/or Hughes violated FBI policy in failing to make a FD–302 record of the events surrounding the early morning contact on January 9, 1992, as it was reasonably predictable that encounter may become the subject of testimony. The internal policy requires the agent to report information "which may be the subject matter of testimony" of an FBI agent. Any breach hardly rises to the level of "extreme misconduct" necessary to impose the requested sanctions. Further, defendant has not demonstrated any prejudice flowing from the flaw in record-keeping. No sanctions are warranted.

### ORDER

The motion to suppress and the motion for sanctions are **DENIED**.